## CHARLESTON.

BANK OF PIEDMONT *v.* BOWMAN *et al.*

Submitted June 15, 1894.—Decided December 15, 1894.

FRAUDULENT CONVEYANCE.
    A case in which the court refuses to set aside a conveyance for fraud.

W. B. MAXWELL for appellant:

I.—*Depositions must be held open until the expiration of the*

*hours named in the notice, unless the opposite party sooner appear to cross examine the witnesses.*—4 Munf. 80.

II.—*Badges of fraud;—Burden of proof;—Embarrassment of grantor;—Pendency of, or expectation of suit;—Concealment of deed;—Misrecital in deed &c.*—86 W. Va. 649; 34 W. Va. 696; 85 W. Va. 547; 85 W. Va. 719; 85 W. Va. 754; 37 W. Va. 3; Id. 572; Id. 675; Id. 687; Bump. Fraud. Con., 56, 31 to 46, 51, 54.

P. J. CROGAN for appellee:

I.—*Deed absolute, shown to be a mortgage.*—16 W. Va. 443; 12 W. Va. 247; 22 W. Va. 2.

II.—*Notice to take Depositions:*—Code, c. 130, s. 35; 4 Minor, p't 2, 1490.

III.—*Service of Notice on Corporation.*—Code, c. 124, s. 7; Code, c. 52, s. 18; Code, c. 53, s. 59, 61.

IV.—*Right to cross-examine.*—2 Bart. Ch'y Pr. 746; 4 Munf. 80.

BRANNON, PRESIDENT:

This was a suit in equity in the Circuit Court of Tucker county, brought by the Bank of Piedmont against A. H. Bowman and others, in which the plaintiff alleged, that it had recovered a judgment against A. H. Bowman, E. B. Stone and W. H. Lipscomb, and that Bowman and Stone had made various fraudulent dispositions of and incumbrances upon their property, and praying that a conveyance by Bowman to one A. M. Goff of two tracts of land containing sixty seven acres and two hundred and thirty two acres respectively lying in Tucker county, and a deed of trust for three thousand six hundred and fifty six dollars and ten cents on other property, given by Bowman to secure Goff, and a judgment confessed by Bowman in favor of Goff for a debt be set aside, and that Stone be required to bring to light from concealment certain notes and accounts, which he was suppressing in fraud of creditors. Owing to decrees in a case of the First National Bank of Fairmont against A. H. Bowman and others in Preston county, mentioned in the record, the matters of the deed of trust and judgment have been eliminated from this case,

and it is only necessary for us to pass on the conveyance of the two tracts of sixty seven and two hundred and thirty two acres of land in Tucker county and the notes and accounts, which Stone is charged with concealing from creditors.

Now, then, as to the tracts of sixty seven and two hundred and thirty two acres of land conveyed by Bowman to Goff. The debt, which the plaintiff would assert against these lands, originated on November 8, 1887. Bowman sold these lands to one John J. Cline as far back in time as January 1, 1883, as shown by a written contract acknowledged and duly recorded January 31, 1884. Thus the fact appears, and it is one of decisive force in the case, that long before this debt arose these lands had been sold by Bowman; and I will add as showing the good faith of this sale, that none of the debts referred to in the bill which in later years embarassed and ruined Bowman, existed at the date of this sale, and the bill states that at the date of November 8, 1887, Bowman was worth thirty thousand dollars and was indebted only in a very small amount. So it is clear, that unless on account of something afterwards occurring the right of Cline and any right derivative from it must stand stable against the debt of the Bank of Piedmont.

But it is claimed that something did afterwards occur to render these lands liable to this debt, and that is, as alleged in the bill, that, when Bowman became involved, he managed to induce Cline to surrender his said purchase, and thereupon Bowman in order to defraud creditors conveyed the lands to his son-in-law, Goff, by deed dated December 2, 1887. Cline, who is no relation to the parties, swears, that he applied to Goff for a loan of five hundred dollars to finish payment to Bowman for the land under his contract of purchase of January 1, 1883, and Goff demanded security for the loan, and it was agreed that Bowman instead of conveying under that contract to Cline should convey to Goff, and that Goff should hold the land until Cline should repay the five hundred dollars and that Goff did lend him the money, and he paid it to Bowman in discharge of the purchase-money due him, and Bowman by order of Cline made the deed to Goff. Goff swears the same, and that he had no conversation with Bowman about the loan to Cline or

appointed three commissioners to set apart and assign the same to her; and defendant Miller appealed.

The demurrer was properly overruled; for neither the common-law remedy retained nor the summary remedy by motion given by statute shall be construed to take away or affect the well-established jurisdiction, which courts of chancery have long exercised over the subject of dower (see section 8, c. 65, of the Code); and Rankin Wiley, as the trustee invested with the legal title, and defendant Miller, the beneficiary claiming his trust-deed to be paramount to her claim of dower were both proper parties.

The only remaining question is: Was the court right in holding her entitled to dower? The authorities, as far as they have been brought to our attention, and we have been able to examine them, seem to be all one way holding with one accord, that a conveyance of land to the husband, who, at the time he receives his deed, executes a deed of trust to secure the unpaid purchase-money, does not give the husband such a seisin in the land as will entitle his wife to dower.

The statute says: "A widow shall be endowed of one third of all the real estate whereof her husband or any other to his use was, at any time during the coverture, seized of an estate of inheritance, unless her right to such dower shall have been lawfully barred or relinquished." Code, c. 65, s. 1. And this has been our statute-law since 1705. See 1 Rev. Code, 1819, p. 403, note a. But it has always been held, that, where the land is conveyed to the husband, and he by deed of the same date conveys the land to a trustee in trust to secure the purchase-money, the two conveyances are parts of one and the same transaction, and the seisin of the husband being instantaneous and transitory, the widow to that extent is not entitled to dower. *Gilliam* *v. Moore* (1832) 4 Leigh, 30 (24 Am. D. 704). It has become a rule of property, and "a different decision at this day would be exceedingly mischievous, and open an inexhaustible source of litigation." Carr, Judge, *Id.* 32. See *McCauley* v. *Grimes*, (1830) 2 Gill. & J. 318 (20 Am. D. 434); *Wheatley* v. *Calhoun* (1841) 12 Leigh, 264 (37 Am. D. 654); and *Wilson* v. *Davisson*, 2 Rob. (Va.) 384, where it was

held that the vendor's lien for unpaid purchase-money is paramount to the wife's right of dower, although the husband has the legal seisin ; and, by section 3 of chapter 65, the law giving her dower in the surplus after satisfying the lien is made to conform to the dissenting opinion of Judge Allen. *Robinson* v. *Shacklett* (1877) 29 Gratt. 99; *Summers* v. *Darne* (1879) 31 Gratt. 791 ; *Holbrook* v. *Finney*, 4 Mass. 566; *Clark* v. *Munroe* (1817) 14 Mass. 351. Dower must give way to the vendor's lien. *Sinnett* v. *Cralle*, 4 W.Va. 600 ; *Hunter* v. *Hunter*, 10 W. Va. 321; *Holden* v. *Boggess*, 20 W. Va. 63; *Martin* v. *Smith*, 25 W. Va. 580 ; and the lien remains as long as the legal title is retained. *Findley* v. *Armstrong*, 23 W. Va. 113 ; *Poe* v. *Paxton's Heirs*, 26 W. Va. 607.

In *Cowardin* v. *Anderson* (1883) 78 Va. 88, it was held that the doctrine of treating the deed of conveyance and the trust as constituting one and the same transaction, and therefore the seisin acquired as transitory applies equally in favor of the third person who advances the purchase-money and at the time of the conveyance takes a mortgage on the land as his indemnity; and, although not a case involving the right of dower, I see no reason why the same principle should not be applied in such cases. See *Coffman* v. *Coffman* (1884) 79 Va. 504.

In *Hurst* v. *Dulaney* (1891) 87 Va. 444, the principle was held in a case involving the right of dower to apply for the benefit of an assignee of the purchase-money; and I see no reason why it should not be applied to one, who as in this case is an assignee—in substance, a *quasi* assignee—as well as an assignee in the proper sense; and this view was taken in *Kaiser* v. *Lembeck* (1880) 55 Ia. 244 (7 N. W. Rep. 519) not in a case, however, involving the right of dower.

So in *Curtis* v. *Root* (1868) 20 Ill. 53, 57, the same doctrine had been laid down in favor of one taking a mortgage for the money advanced by him to pay the purchase-money. *Moring* v. *Dickerson* (1881) 85 N. C. 466.

In *Welch* v. *Buckins* (1859) 9 Ohio St. 331, the rule was held to apply, whether the mortgagee (as defendant Miller was in this case) conveys the land to the mortgageor (as Roush was in this case) conveys the land himself or pro-

cures one who can convey the legal title to do so, as was done by Howard, commissioner, in this case at the instance of Miller. The fact of such cross-conveyances was held not to affect the case; for the substance, not the form merely of the transaction is to be regarded. This was like the case here a case of dower; but by virtue of the statute in Ohio and Maryland it has been held, that a third person, who advanced the money to enable the purchaser to buy, is no party to the transaction. He, who thus advances the money, is not privy to the sale. See *Stansell* v. *Roberts* (1844) 13 Ohio 149, 157, and *Heuisler* v. *Nickum* (1873) 38 Md. 270. With us there is no statute to negative by implication the application of the doctrine to such a case as the one in hand, where the two deeds are made at the same time as dependent parts of one and the same transaction, by which in pursuance of agreement defendant Miller turns the lien paramount to dower held by the court for him into one of like dignity held by himself. Such is the intent of the parties, which the law imputes, drawn from the nature of the transaction.

Therefore, considering that the original lien in this case was held for the benefit of defendant Miller confessedly paramount to plaintiff's right of dower, and that by the agreement of the parties the legal seisin was to be and was in Roush only *in transitu* on its way to Wiley, the trustee, to be held by him for the purpose of securing the identical money by a private instrument under the more complete and effectual control of the parties, it would be a harsh construction of the law to hold such agreement abortive and ineffectual to accomplish the lawful purpose plainly intended (see *Childers* v. *Smith* [1820] Gilmer, 196, 200); for it is but another mode of expressly reserving on the face of the two conveyances, treated as one, a lien on the land for the payment of the unpaid purchase-money.

With this view of the case, we are of opinion, that the decree complained of is erroneous, and that plaintiff is only entitled to dower in the surplus after the deed of trust is satisfied. Reversed and remanded.

# CHARLESTON.

HART *et al. v.* SANDY *et al.*

Submitted June 20, 1894.—Decided December 15, 1894.

1. SALE—FRAUD—DEBTOR AND CREDITOR.

S. purchases a sawmill and fixtures in October, 1889, from H. and pays him three hundred dollars cash and executes two notes for two hundred and ninety dollars each payable in nine and eighteen months with interest for the residue and agrees to give a deed of trust on said property to secure said deferred payments. He does not execute the trust at the time for the pretended reason, that he is in a hurry to remove the property to another county, where he resides, but promises H. that, if he will prepare and send the trust-deed to him, he will execute it and have it placed on record. In the month of February, following said deed of trust was prepared and presented to said S. on two occasions, when he declined to execute it. In the month of April following he sold said property to the widow of his deceased brother, who through her husband and agent had notice of the debt due H. the agreement to execute said trust and the refusal on the part of S. to comply therewith. At the time of the sale a written conveyance of this personal property was executed acknowledged and recorded, and more than twenty days thereafter four hundred and eighty dollars of the purchase-money was counted out by defendant N., the second husband, as the agent of his wife to S. in the presence of a witness who was called in. About the time of the purchase of said mill and fixtures by S. he sold his lands for two thousand and one hundred dollars. Shortly after the sale of the mill-property he sold his horse to said husband, which was all the property owned by him in this state; and said S. then left the state without securing the notes of H. and has remained away ever since. *Held,* that these circumstances show, that the sale of said mill-property was made with intent to hinder, delay and defraud H., and that N. the wife of said agent, had notice of the fraudulent intent, and that said sale was void as to H.

2. SALE—FRAUD—DEBTOR AND CREDITOR.

A creditor can not purchase the goods of his debtor at a price in excess of his debt, when he knows that the excess so paid such debtor is by the latter to be placed beyond the reach of his other creditors. Such purchaser is a participant in the fraud of his debtor, whether his purpose be to aid him or not.

3. SALE—FRAUD—DEBTOR AND CREDITOR.

Wherever there appears to be connected with the transaction

circumstances indicating excessive effort to give it the appearance of fairness or regularity, which are not usual attendants of such business, the courts will regard such circumstances as badges of fraud.

WELLS & PENDLETON for appellants:

I.—*The argument created an equitable lien on the property.*—3 Pom. Eq. Jur. § 1235; 2 Sto. Eq. Jur. §§ 1219, 1220, 1228, 1231, 1502; 1 Jones Liens § 77; 2 Am. Dec. 696; 4 Am. Dec. 604; 19 Am. Dec. 398; 8 Gratt. 224; 21 W. Va. 516; 30 W. Va. 790.

II.—*Notice.*—Sto. Eq. § 140; Whar. Ag. §§ 177, 178; 1 Par. Con. (6th Ed.) s. p. 74, 76; 1 Am. & Eng. Ency. L. 419 and n., 429; 6 Am. Dec. 268; 9 Am. Dec. 738; 49 Am. Dec. 57; 13 N. H. 145; 115 Ill. 289; 80 Mo. 179; 1 Am. St. Rep. 659; 9 Am. St. Rep. 698; 5 Leigh 658; 32 W. Va. 259.

III.—*Constructive notice.*—3 Conn. 146; 7 Conn. 333; 9 Conn. 286; 13 Ves. 121; 9 Paige 470; 5 Leigh 627, 655–657; 23 W. Va. 595; 30 W. Va. 784; 32 W. Va. 259.

W. A. PARSONS for appellees cited 16 Am. Rep. 100; Bump. Fraud. Convey. 228; 35 W. Va. 547; 46 N. Y. 384; 11 Ill. 665; 45 Am. Rep. note 184; Id. 178; 79 N. Y. 102; 27 Hun. 359; 1 Par. Cont. 74, 75, note; 1 Am. & Eng. Ency. L. 419 note, 420, 421; 39 Am. Rep. 319; 37 Am. Rep. 750; 1 Am. Rep. 164; 13 Am. St. Rep. 208; 32 W. Va. 259; 30 W. Va. 791; 21 W. Va. 516; 13 Am. & Eng. Ency. L. 608; 3 Pom. Eq. Jur. § 1233.

J. W. C. ARMSTRONG and G. F. CUNNINGHAM for appellees cited 1 Am. & Eng. Ency. L. 419, 420, 421; 115 Ill. 289; 8 Kan. 519; 113 Mass. 391; 129 Mass. 290; 102 U. S. 263; 1 Per. Tr. (3d Ed.) § 222; 39 Am. Rep. 319; 23 W. Va. 101; 17 Gratt. 96; 34 W. Va. 230; 32 W. Va. 482; 3 Gratt. 328.

ENGLISH, JUDGE:

This was a suit in equity brought by C. M. and J. B. Hart in the Circuit Court of Roane county against G. W. Sandy, Samuel Noe, Letitia Noe, William E. Swiger, trus-

tee, B. F. Lowe, John Nay and G. T. Harrison. The plaintiffs say in their bill that on the 15th of October, 1889, they sold to the defendant, G. W. Sandy, a boiler for use in a steam-mill, a sawmill rig and fixtures, a bill of pulleys, small shafting, boxing, piping, belts, and an inspirator and fixtures for use in connection with said sawmill at the price of eight hundred and eighty dollars, of which sum said Sandy paid three hundred dollars and executed to plaintiffs his two promissory notes for two hundred and ninety dollars, each bearing date the 15th day of October, 1889, and falling due respectively at nine and eighteen months with interest from date at six *per cent. per annum* for the residue of said purchase-money ;—that at the time of said sale to said Sandy and the execution of said notes by him it was expressly understood and agreed by and between the plaintiffs and said Sandy, that he should execute a deed of trust upon said property so purchased to secure said two promissory notes, and that said notes recite on their face, that they are secured by deed of trust, but the said deed of trust was not then prepared, for the reason that said Sandy was in a hurry to get his said mill and fixtures removed to the place, where he expected to set the same up, and the plaintiffs then agreed to have said deed of trust drawn up and sent to said Sandy for his signature and acknowledgment at an early day ;—that plaintiffs did afterwards have said trust deed prepared, and about the 1st of February sent the same to said Sandy for his signature and acknowledgment, but he failed and refused to sign or acknowledge said trust-deed and has not as yet signed the same ;—that at the time of the purchase of said property from plaintiffs said defendant was the owner of a steam-engine and fixtures for a gristmill, which he had purchased from the defendants B. F. Lowe, John Nay and G. T. Harrison, and which was then located in the county of Harrison ;—that after said purchase from plaintiffs he moved the property purchased from plaintiffs and the property purchased from Lowe, Nay and Harrison to the county of Roane in this state ;—that, after said Sandy had run said sawmill for several months, he, by and with the advice of the defendant Samuel Noe made a voluntary and fraudulent transfer of said sawmill

and fixtures and said gristmill and fixtures and also of a horse, saddle and bridle, which he then owned, to the defendant Letitia Noe, who was then and still is the wife of said Samuel Noe;—that the said Samuel Noe pretended to be acting as the agent of his wife in the purchase of said property from the defendant Sandy;—that said transfer was made by written instrument in the form of a deed which was brought to the town of Spencer by said Noe and filed in the clerk's office for record, and is now of record in said clerk's office, a certified copy of which is filed as Exhibit A; —that the said transfer of said property was made by said Sandy with intent to hinder, delay and defraud his creditors of and from what they are entitled to, and especially to hinder, delay and defraud the plaintiffs in the collection of their said debt against him, and to screen said property so that it could not be reached by legal process in any proceeding which plaintiffs might institute for the recovery of their said claim;—that said Letitia Noe and Samuel Noe had full notice and knowledge of the fraudulent intent of said G. W. Sandy in making said transfer, and full notice, that Sandy was largely indebted to the plaintiffs and to other persons and had contracted to give plaintiffs said deed of trust to secure said debt to them;—that said Samuel Noe was the confidential adviser of said Sandy in said transaction and participated with him in said scheme for the purpose of aiding him in carrying out his fraudulent designs against the plaintiffs and colluded with the said Sandy and procured him to make said conveyance to the said Letitia for the further purpose of profiting himself thereby;—that said transfer to said Letitia was voluntary and not upon a consideration deemed valuable in law;— that, if any money or other thing of value passed from said Letitia to Sandy as a consideration for said transfer, it was again returned to her by said Sandy;—that, if any payment of money was made, the said Sandy furnished the same and caused it to be paid for the purpose of giving color and semblance of fairness to said transaction;—that soon after said fraudulent transfer of said property said Samuel Noe, pretending to be acting as the agent of his said wife called in a witness and turned over to the

said Sandy four hundred and eighty dollars, claiming the same was the last payment on said mills, which he pretended to be paying for his wife, Lettia Noe, and took from the said Sandy a written receipt for said money, all of which plaintiffs charge was done for the purpose of giving color to said alleged sale and for no other purpose, and which money was either furnished by the said Sandy for said purpose or was returned by him to the said Samuel and Letitia Noe;—that said Sandy left the state soon after said transfer without having provided for the payment of the plaintiffs' demand, or securing the same in any way, and that the property so transferred was the only property owned by said Sandy at that time and was worth at least two thousand dollars;—that said Sandy had taken said Samuel Noe in as a partner in said milling business a short time before said transfer, and that said Letitia was prior to her marriage to said Samuel Noe the widow of a deceased brother of said Sandy;—that said Sandy was an unmarried man and boarded in the family of said Samuel Noe for some time previous to said transfer;—that the said sawmill, boiler and fixtures, *etc.*, are now located on the lands of Samuel Noe in Roane county and were so located prior to said transfer;—that about the 1st day of October, 1889, said G. W. Sandy executed to the defendant W. E. Swiger, trustee, a deed of trust upon said engine and gristmill and fixtures to secure to the defendants B. F. Lowe, John Nay and G. T. Harrison the sum of five hundred dollars therein mentioned, but plaintiffs are not informed, whether the same has been paid or not, which deed of trust was duly admitted to record, and the plaintiffs call on said Lowe, Nay and Harrison to answer and say how much, if anything, has been paid on said trust-debt, and what amount remains unpaid thereon;—and they pray that said fraudulent transfer of said property to said Letitia Noe may be set aside and declared fraudulent and void as to the plaintiffs' demand, that they may have a decree for their claim against said Sandy, and that said sawmill and fixtures *etc.*, may be sold to satisfy the plaintiffs' demand *etc.*

B. F. Lowe, John Nay, G. T. Harrison, and W. E. Swiger, trustee, answered said bill denying that anything had

ever been paid on their trust-deed. Samuel Noe also answered said bill stating that G. W. Sandy owed him six hundred dollars in April, 1890, and that Letitia Noe, his wife, had something over five hundred dollars in cash, which she had received as a sum in gross in lieu of dower in her former husband's estate; and that to enable him to save said six hundred dollars she agreed to purchase the mill property, fixtures *etc.*, of said Sandy, if respondent would pay as much as five hundred dollars on said property and wait on her until a sale of said property could be made to enable her to repay him, which proposition was agreed upon, and she made the purchase; and he proceeds to put in issue every material allegation of the plaintiffs' bill. Letitia Noe also filed her answer putting in issue the allegations of the bill as to her connection with the transaction.

The plaintiffs also filed an amended bill, in which they alleged, that the agreement made and entered into between said G. W. Sandy and the plaintiffs at the time of the sale of said sawmill and fixtures, that the said Sandy would give a deed of trust on the said property as security to the plaintiffs for the said two promissory notes of two hundred and ninety dollars each, was a part of the consideration of said sale to said Sandy and created an equitable lien upon said property in favor of the plaintiffs, of which the said Samuel Noe and Letitia Noe had notice, at the time the defendant Letitia Noe purchased the said property from said Sandy through the said Samuel Noe as her agent; and they pray, that in the event the court should be of opinion, that the transfer of the entire property from said Sandy to said Letitia is not fraudulent or voluntary, then the plaintiffs' equitable lien created by said agreement may be enforced against the said property, and the same be sold to satisfy the plaintiffs' debt and costs.

G. W. Sandy demurred to said amended bill, and Samuel Noe and Letitia Noe answered the same, and the cause was heard upon the bill, amended bill, answers to each and replications thereto and upon the demurrer to said amended bill, which demurrer upon consideration was overruled by the court and disallowed; and the court held that the plaintiffs were not entitled to the relief prayed for and

82

dismissed their original and amended bills with costs but without prejudice as to any suit, which the plaintiffs might thereafter institute against said G. W. Sandy; and from this decree the plaintiffs appealed.

The first error assigned and relied upon by the appellants is, that the court erred in holding said transfer of said property to Letitia Noe valid as against appellants' debt, claiming that the proofs show clearly, that there was fraud in the transfer, and that defendants Samuel and Letitia Noe had notice of G. W. Sandy's fraudulent intent and participated therein.

In determining a question of this character this Court has frequently held, that the surrounding circumstances may be taken into consideration, and from the fact, that fraud seeks concealment, circumstantial evidence is frequently the only evidence that can be obtained. The question then presented for our determination is: Did G. W. Sandy convey the property in the bill mentioned to Letitia Noe with intent to hinder, delay and defraud the plaintiffs in the collection of their debt, and did said Letitia Noe have notice of said fraudulent intent? When we go to the date of the purchase of the mill and machinery by G. W. Sandy from the plaintiffs, we find that said Sandy shortly before purchasing said machinery had sold his land for two thousand one hundred dollars in cash and a horse valued at seventy five dollars, and that out of this he paid the plaintiffs the cash payment of three hundred dollars on said sawmill and fixtures on the 15th day of October, 1889, and executed to the plaintiffs his two notes for two hundred and ninety dollars each payable respectively in nine and eighteen months with interest from date for the residue, which notes were to be secured by deed of trust upon said sawmill and fixtures, when said machinery was delivered to him.

C. W. Gould states in his testimony that the reason said deed of trust was not executed at the time the sale was made was that it was the middle of the afternoon before the trade was consummated, and G. W. Sandy did not want to wait until the deed could be prepared, as he wished to get to Jane Lew in Lewis county that evening; but he

made arrangements with the plaintiffs to prepare same and send it to him in Roane county (Sandy's home) and then he would execute said deed and have it put on record in Roane county at the plaintiff's expense. Said witness also states that the plaintiffs prepared said deed of trust and sent it to said Sandy by him, and that he communicated the facts concerning the agreement between plaintiffs and said Sandy to execute said deed of trust to said Samuel Noe, the defendant, by reading to him a letter from C. M. Hart to witness setting forth said agreement prior to the 1st of April, 1890 ; that he was trying to induce Noe to influence said Sandy to execute the deed of trust, which he had at the time, as he, Sandy, was liable to have trouble unless he did so ; that at the time witness read the letter to said Noe from Hart, before referred to, which was prior to April 1, 1890, he (Samuel Noe) remarked to witness that he had no interest in the controversy of Sandy with Hart, and that Sandy would have to settle that, but he (Noe) had already bought a one third interest in said mill and machinery, and had paid Sandy for same in cattle and lands, which conversation took place at the Taylor schoolhouse. The witness further says that he presented said deed of trust to said Sandy twice in the month of February, 1890, and he refused to execute it each time, but did not deny his agreement with plaintiffs to execute the same.

Now, it appears that Letitia Noe, to whom this property was conveyed on the 26th day of April, 1890, before she became the wife of Samuel Noe, was the widow of G. W. Sandy's brother. She was sick in bed at the time this property was conveyed to her. It also appears that on the 22d day of February, 1890, she had received from W. S. Haymond the sum of five hundred and forty four dollars and fifty cents as a gross sum in lieu of her dower in certain lands of which her first husband died seised and possessed, and that in order to save about six hundred dollars, which G. W. Sandy owed her husband, Samuel Noe, she agreed to purchase said mill-property and fixtures from said Sandy, her said husband acting as her agent in the transaction. This statement, however, does not comport well with the statement made by said Samuel Noe to the witness Gould,

that he had already bought one third of said mill and machinery from said Sandy and paid him in land and cattle. The question naturally suggests itself: If said G. W. Sandy owed said Samuel Noe six hundred dollars, why did he pay him in lands and cattle for said one third interest, and why the necessity of said Letitia Noe advancing her five hundred dollars to aid in purchasing said property to save a debt of six hundred dollars due her husband, when said husband had been paying said Sandy in lands and cattle for a portion of the property? And again, the witness Gould says that said Samuel Noe asked him "if he did not think that Sandy (or we) had set that job up nicely on Hart." Samuel Noe states in his deposition that he acted as the agent of his wife, Letitia Noe, in the purchase of the mill property, and that he had heard from one Gould that said Sandy was to give a deed of trust to plaintiffs to secure their debt, but that Sandy denied it.

The evidence, then, clearly shows that Samuel Noe had notice of the existence of the debt from said Sandy to plaintiffs, and the fact that he had agreed to secure the same by trust-deed. When we consider the intimate relations between husband and wife and the relationship existing between said Sandy and Letitia Noe and the further fact, that said G. W. Sandy had been doing business in partnership with Samuel Noe, and that said Letitia was called upon to pay out her own money, which she had received from her deceased husband's estate, there can be no doubt, that this transaction had been thoroughly discussed between said G. W. Sandy and Samuel Noe and his wife. Said Samuel Noe in his deposition states that said Sandy told him that he owed plaintiffs about five hundred dollars, and, when asked the question : "Did you not agree with G. W. Sandy to pay plaintiff's claim against him?"—replied, "I did not; Sandy told me that he would leave a payment for Hart at Charleston."

Again, it appears in evidence that when G. W. Sandy conveyed to said Letitia Noe said mill property he parted with all the visible property he owned, except a horse, saddle and bridle, which the defendant Samuel Noe says he afterwards purchased from him, paying him therefor one hundred dollars.

Another circumstance, which should be given some im‑ portance in this case, is that the witness, Geary, states that on the 20th day of May, 1890, twenty four days after the date of said conveyance to said Letitia Noe and twenty one days after said conveyance was acknowledged and admitted to record, Samuel Noe paid G. W. Sandy four hundred and eighty dollars for the defendant Letitia Noe, which witness counted, and Mr. Noe took a written receipt for the money, which he witnessed at their request. Why was this particularity and formality observed, if there was not some apprehension? and that there was not only notice, but also apprehension of some difficulty in making the purchase is apparent from the testimony of Edmund Hugill, who states that he asked Mr. and Mrs. Noe, if there was any arrangement to pay the notes given by Sandy to Hart for the mill. Their answer was that there was no arrangement made, and that they would not pay the notes. He then informed them that he would sell the mill, if they did not pay said notes. Mr. Noe said he would be with us or something to that effect. Witness then asked Noe, if he did not know, that the trade with Sandy was not to be closed until the deed of trust was executed as agreed by Sandy. He answered in the presence of Le‑ titia Noe, that he knew about the deed of trust, or that he had heard of the deed of trust, but that he had taken counsel of an attorney, and that he had told him (Noe) that there was nothing on record against said property, and that he would be safe in buying it. Now, while it is true this conversation occurred after said Sandy had sold said property to Letitia Noe, yet it shows an admission on the part of said Samuel Noe, that he knew about the deed of trust or had heard about the deed of trust and had taken counsel of an attorney in regard to the matter, who advised him that there was nothing on the record against said property, and he would be safe in buying it.

The circumstances shown by the evidence in this cause can lead to no other conclusion than that G. W. Sandy made this conveyance to his relative Letitia Noe with the intention of hindering, delaying and defrauding the plain‑ tiffs. Shortly before purchasing this mill and machinery

from the plaintiffs he had sold his land for two thousand and one hundred dollars cash and a horse valued at seventy five dollars. At the time of the purchase of said machinery he was in so much of a hurry to leave Shinnston and reach Jane Lew, that he had not time to execute the deed of trust to secure the notes given by him for the deferred payments, and when the trust-deed was prepared and sent to him for execution in Roane county, and although the same was presented to him twice in the month of February 1890 with a request, that he should execute it, he positively refused. His scheme was to sell said mill and fixtures to his relatives in such a way, that it could not be reached by plaintiffs, pocket the proceeds and go to the Western states. At least that was what he attempted to do, and that was the reason that Samuel Noe consulted counsel, as shown by the deposition of the witness Hugill, to ascertain whether he would be safe in buying the property.

Did Letitia Noe have notice of the fraudulent intent of G. W. Sandy in selling and conveying said property to her (for a written conveyance was executed and acknowledged and recorded when the property would have passed by delivery, being personal property)? It appears from the testimony of Samuel Noe and from the answer of himself and wife, that he acted as the agent of his wife in making the purchase of this machinery.

Upon the question of notice, we find the law stated thus in 1 Am. & Eng. Ency. Law, p. 419: "In the relation of the principal to a third party, the undisputed rule exists that notice to the agent is notice to the principal, if the agent comes to the knowledge of facts while he is acting for the principal. But notice to the agent, to bind the principal, must be within the scope of the agent's employment."

In the case of *Jackson* v. *Sharp*, 9 Johns. 163, it was held that, "if a subsequent purchaser have notice at the time of his purchase of a prior unregistered deed, it is the same to him as if such deed had been registered; and if the agent of such subsequent purchaser, at the time of making the purchase, knows of the prior or unregistered deed, it is the same as notice to his principal."

1 Pars. Cont. (8th Ed.) p. 75, states the law upon this point as follows : "A principal is affected by notice to his agent respecting any matter distinctly within the scope of his agency, when the notice is given before the transaction begins, or before it is so far completed as to render the notice nugatory. The notice to an agent may be implied as well as expressed ; knowledge obtained by the agent in the course of that very transaction is notice." And in the note it is said : "The reason generally given for charging the principal with notice is that it is the duty of the agent to communicate to his principal the knowledge he has of the subject-matter of the agency ; and in the latter class of cases (that is, where it was recently acquired) it is said that he is bound to do so irrespective of when the information was acquired, and that he is presumed to discharge this duty."

Upon this point we find it stated in Story, Ag. § 140 : "Notice of facts to an agent is constructive notice thereof to the principal himself, where it arises from or is at the time connected with the subject-matter of his agency ; for, upon general principles of public policy, it is presumed that the agent has communicated such facts to the principal, and, if he does not, still, the principal having intrusted the agent with the particular business, the other party has the right to deem his acts and knowledge obligatory upon the principal; otherwise the neglect of the agent might operate most injuriously to the rights and interests of such party."

Bump, on Fraudulent Conveyances, on page 494, says : "The notice of the fraud need only be sufficient to put a man of ordinary prudence and experience in business transactions upon the inquiry. * * * Whatever is sufficient to direct his attention to the prior rights and equities of creditors, and to enable him to ascertain their nature by inquiry, will operate as notice. When a purchaser has knowledge of any fact sufficient to put him upon inquiry, he is presumed either to have made the inquiry and ascertained the extent of the right that he may possibly prejudice or to have been guilty of a degree of negligence fatal to the claim to be considered a *bona fide* purchaser. This

notice may be derived from its statement of creditors or other parties. * * * The purchaser is chargeable with notice of all the matters which appear to be within the knowledge and memory of his agent." Again, on page 204, the same author says: "It is not necessary that the grantee shall be one of the originators of the fraudulent scheme. * * * There is no difference between those who form the design and those who afterwards enter into it with a knowledge of its character, and aid in carrying it out. The grantee is also bound by the acts of his agent which he adopts and confirms, and, if they are fraudulent, his own innocence will not suffice to protect the transfer."

Other authorities might be cited showing that notice to the agent while acting in the scope of his authority must be regarded as notice to the principal, but these are regarded as sufficient. I will, however, call attention to a portion of the opinion of Cabell, J., in the case of *French* v. *Loyal Co.*, 5 Leigh 658. He says: "But although the law in many cases imputes notice to a man on evidence far short of that which, if its weight only were considered, would be necessary to prove actual notice, yet, if we attend to the nature and character of the facts which the evidence in such cases does establish, we shall see that the law in imputing notice acts with its usual justice and equity. Thus on proof of notice to an agent, the law at once imputes notice to the principal, not because notice to the agent is proof that the principal actually had notice also, but because it is a fact of such a character that the principal ought to be as much bound by it as if he had notice." See, also, *Newlin* v. *Beard* 6 W. Va. 111, and *Fidelity Ins. T. & D. S. Co.* v. *Shenandoah Val. R. Co.*, 32 W. Va. 244 (9 S. E. Rep. 180) where this Court held that notice to a trustee was notice to a *cestui que trust, etc.*

Now, all these authorities, when applied to the facts and circumstances of this case, preclude the defendant Letitia Noe from denying, that she had notice of the fact, that G. W. Sandy was indebted to the plaintiffs in the sum of five hundred and eighty dollars, and that he had agreed to execute a deed of trust upon the property she purchased from him to secure the payment of said sum, and, although said

about the conveyance of the land to Goff, but his transaction was wholly with Cline. Thus the conveyance to Goff from Bowman created in Goff not an absolute estate in the eyes of equity, but an equitable mortgage to secure Goff his loan with right of redemption in Cline. *Ferguson* v. *Bond, supra*, p. 561 (20 S. E. Rep. 591); *Vangilder* v. *Hoffman,* 22 W. Va. 2. Bowman had no longer any interest in the land which creditors could subject. He had not had since January 1, 1883. If Cline and Goff do not falsify, such is unalterably the state of the case as to these lands. There is not a bit of evidence to contradict them in this matter. Can we arbitrarily reject their evidence, when there is not even a cross-examination to impugn it?

Several witnesses were examined on the plaintiff's side, but their evidence only tends to show that Goff was not pecuniarily able to raise money to make this loan and the loan of Bowman of three thousand six hundred and fifty six dollars and ten cents for which the deed of trust and judgment were given. Let us concede, that he was not able to do both, yet he may have been able to lend this five hundred dollars. And if—as I do not think we can—we could look to the case of *Bank* v. *Bowman,* 36 W. Va. 655 (14 S. E. Rep. 989) we would find that debt was never claimed to be wholly a loan by Goff to Bowman, but the larger part from a gift to Goff's wife by Bowman in years gone by. Anyhow it is clear not only from witnesses for Goff but even from witnesses for the bank, that Goff was worth from two thousand dollars to three thousand dollars, was a good farmer, raised and sold cattle, engaged very considerably for years in logging and lumbering, was an active, hardworking, saving man and of honorable character. Why is it improbable that he made the loan of five hundred dollars? We have positive evidence by two undisputed witnesses, that he did make this specific loan; and his state and condition as proven by other witnesses lend corroboration to their evidence. A circumstance cited against the fairness of the transaction is, that when Cline paid this purchase-money debt to Bowman with only five hundred dollars there was due six hundred and twenty one dollars; but this is not certain, for we do not know as a matter of fact, that

several payments had not reduced it. It is said that though this deed was made Decemebr 2, 1887, it was not put on record till February 27, 1888. Sometimes withholding a deed from record may be a circumstance of fraud, but it would seem rather the reverse here, for we would suppose, if sedate fraud was intended, the party would hasten to put it on record. Failure to record is often owing to mere neglect and procrastination. Bowman's deposition is not in the record. It may be that in urging payment of this debt by Cline he intended to get it out of the way of creditors, but that does not convict Goff of fraud in lending Cline money to pay, or Cline in paying it to Bowman. The fact that the deed from Bowman to Goff was only a mortgage is confirmed by a writing found in the record, which both Cline and Goff say was executed, dated March 27, 1888, by which Goff sold this land to Cline for five hundred dollars, and was to deed the land to Cline on payment of purchase-money. This simply attests in writing what had been orally agreed. The relationship of Bowman and Goff does call for explanation as argued, but the evidence of a disinterested witness (Cline) supported by Goff's furnished fair explanation. Were it simply a conveyance by Bowman to Goff, it would wear a different hue; but it is a loan by Goff to Cline to pay Bowman purchase-money under a sale from Bowman to Cline years before any trouble—a fact not disputed, nor capable of disputation. So I conclude that the court below did not err in refusing to hold the land liable.

It is argued, but not apparently with confidence, that the court erred in the dismissal of the bill in this further respect; that the bill charges that Stone had carried on the mercantile business and had large sums of money due him upon notes and accounts, which he was concealing from creditors, amounting to about six thousand dollars, and, as it was taken for confessed by Stone, the bill as to this matter should not have been dismissed. The bill was too indefinite in this matter to warrant a decree upon it taken alone. What sort of a decree could have been pronounced upon it? I doubt whether there could have been a personal decree against Stone for the specific sum of six

thousand dollars; but a personal money decree is not the one aimed at, or which would be warranted under the bill, as it contemplates an ascertainment of debtors of Stone, and pursuit of funds in their hands, as it prayed that Stone turn over the notes and accounts, that they might be collected. This being so, there is no basis for such a decree. Who are the debtors of Stone, and what amounts do they owe? We know not. There is not a particle of evidence to answer these questions. It is a bill of discovery stopping short of discovery. Why did not the plaintiff compel a discovery? Why not compel an answer and the production of notes and accounts? It does not even put Stone on the stand to disclose the debts or furnish any evidence.

Another assignment of error is that the witnesses left the place of examination before 6 o'clock P. M., and plaintiff's counsel had no opportunity to cross-examine them. The notice fixed the hours for taking the depositions between 6 A. M. and 6 P. M. The examination by defendant began at 10 o'clock, A. M., and was concluded at 11:30 A. M., and at 5:35 P. M. plaintiff's attorney appeared to cross-examine; but the witnesses had gone. A reasonable opportunity was given. The counsel showed no diligence to secure his cross-examination. No excuse for the negligence is given. The court could order a cross-examination had it been asked, if there had been any fair excuse by counsel for not having availed himself of the opportunity of cross-examination. These considerations conduct us to an affirmance of the decree.